# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JEANINE DEANNA COAKWELL,**                    CASE NO. 1:19 CV 2876

      Plaintiff,

      v.                                                JUDGE JAMES R. KNEPP II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                      **MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Plaintiff Jeanine Deanna Coakwell ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). For the reasons stated below, the Court affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in September 2016, alleging a disability onset date of July 11, 2016. (Tr. 346). Her claims were denied initially and upon reconsideration. (Tr. 274-77, 284-86). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 291-92). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 8, 2018. (Tr. 86-143). On September 5, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 57-70). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on December 12, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Born in 1984, Plaintiff was 31 years old on her alleged onset date. *See* Tr. 346.  She lived with her fifteen-year-old son and adult roommates. (Tr. 93).  Plaintiff had past work in providing mental health services to the homeless. (Tr. 97). She had a bachelor's degree in social work and began work on a master's degree before stopping due to fatigue. (Tr. 95-96).

Plaintiff believed she could no longer work due to a need to elevate her legs to waist level "[a]s much as possible" because of an orthostatic condition. (Tr. 103-05). She could not manage the condition pharmacologically due to a history of pulmonary emboli and required blood thinners. (Tr. 106-07). She wore compression stockings. (Tr. 107-08). Plaintiff used a wheelchair since May 2017; she could not use other assistive devices such as a walker because she could not bear weight on her arms. (Tr. 109). She could walk independently on a limited basis. (Tr. 114-15).

Plaintiff also had pain in her hands due to arthritis. (Tr. 124-25). She experienced pain and swelling in her hands and fingers with increased activity. *Id*.

Plaintiff "sometimes" drove her car, but normally rode with one of her roommates. (Tr. 94). She tried to do one to two hours of housework per day, working ten to fifteen minutes at a time. (Tr. 120). Plaintiff did not grocery shop or perform outdoor chores; she tried to get out of the house to socialize once per month and walked her dog from a motorized chair. (Tr. 121-22).

2

Relevant Medical Evidence

*Dr. Kuchynski*

Plaintiff established care with Marie Kuchynski, M.D., in December 2015; she sought treatment for rheumatoid arthritis and joint pain in both hands. (Tr. 635). Plaintiff had a normal examination except for mild swelling in her fingers and wrists. (Tr. 638).

In February 2016, Plaintiff had a normal gait on examination, normal range of motion in all extremities, mild swelling in her fingers and wrists, and faint petechial lesions on her legs. (Tr. 633). By March the petechial lesions were gone but the finger and wrist swelling continued. (Tr. 628). This swelling continued through April with an otherwise normal examination. (Tr. 623). In September, Dr. Kuchynski observed mild swelling in the fingers and wrists, and livedo reticularis of the skin. (Tr. 616). Plaintiff had a normal examination in December 2016 except for continued swelling in her fingers and wrists and livedo reticularis. (Tr. 714).

During a March 2017 examination, Plaintiff had a normal gait and mild swelling in her fingers, wrists, and ankle; the livedo reticularis continued. (Tr. 1038-39).

Dr. Kuchynski prescribed a wheelchair in April 2017. (Tr. 919). In June, Plaintiff reported using the wheelchair for long distances due to "overwhelming fatigue". (Tr. 1026). She had a normal physical examination with the exception of mild swelling in her fingers, wrists, and ankle. (Tr. 1031). In September, Plaintiff had an abnormal gait and used a motorized scooter; the swelling in her fingers and wrists continued. (Tr. 1023). By November, the physical findings remained the same and Plaintiff used a wheelchair. (Tr. 1014).

During a February 2018 examination, Plaintiff had an abnormal gait and used a motorized chair. (Tr. 1005). Dr. Kuchynski observed mild swelling of the hands and limited range of motion

3

in her joints. *Id*. She found Plaintiff had edema in her lower extremities for which she wore compression stockings. *Id*.

In April 2018, Plaintiff reported fatigue, dizziness, back pain, and joint swelling with stiffness. (Tr. 988). On examination, Dr. Kuchynski observed continued use of compression stockings, an abnormal gait and station (Plaintiff arrived in a wheelchair), and mild swelling in her hands with limited range of motion in the joints. (Tr. 993).

*Dr. Morren*

In November 2017, Plaintiff consulted with neurologist John Morren, M.D., regarding autonomic neuropathy. (Tr. 1185). She had an unremarkable "general medical examination" and mental status examination. (Tr. 1188). Plaintiff also had a normal motor examination in her upper and lower extremities and normal deep tendon reflexes bilaterally. (Tr. 1189). On sensory examination, Dr. Morren noted "patchy reduction" in Plaintiff's perception of temperature and pinprick in her extremities, lower greater than the upper. *Id*. Dr. Morren described outside autonomic testing which revealed "mildly impaired cardiac parasympathetic function with orthostatic intolerance". (Tr. 1190). He believed, "given [Plaintiff's] history, exam and workup" there was "concern for presyncopal episodes representing transitory cerebral hypoperfusion due to orthostatic pooling of blood in the legs, a likely consequence of venous valvular insufficiency that may be a complication of occult DVT (source of her previous PE)." *Id*. Additionally, Dr. Morren noted Plaintiff's "sensory exam could suggest an underlying small fiber neuropathy as well" and recommended completion of her "autonomic neuropathy work up". *Id*. He recommended a thermoregulatory sweat test, ordered labs, prescribed compression stockings, and provided orthostatic intolerance and fall prevention "guidelines". (Tr. 1190-91). Dr. Morren incorporated

4

the guidelines – entitled "Guidelines for the Nonpharmacological Treatment of Orthostatic Hypotension/Orthostatic Intolerance" into Plaintiff's chart:

1. Make all postural changes from lying to sitting or sitting to standing, slowly.
2. Drink 2.0-2.5 L of fluid per day (if okay with your other doctors).
3. Increase sodium in the diet to 3-5 g per day (if okay with your other doctors).
4. Avoid large meals which can cause low blood pressure during digestion. It is better to eat smaller meals more often than 3 large meals.
5. Avoid alcohol. Alcohol can cause blood to pool in the legs which may worsen low blood pressure reactions when standing.
6. Perform lower extremity exercises to improve strength of the leg muscles. This will help prevent blood from pooling in the legs when standing and walking.
7. Raise the head of the bed by 6-10 inches. The entire bed must be at an angle. Raising only the head portion of the bed at the waist level or using pillows will not be effective. Raising the head of the bed will reduce urine formation overnight and there will be more volume in the circulation in the morning. It may also help orthostatic tolerance during the day.
8. During bad days or prior to engaging in more physical activity than usual, drink 500 mL of water quickly. This will result in increased blood pressure within 5 minutes of drinking the water. The effect will last up to a few hours and may improve orthostatic intolerance.
9. Use custom-fitted elastic support stockings. This will reduce tendency for blood to pool in the legs when standing and may improve orthostatic intolerance. Abdominal binder or "SPANX" may also be useful.
10. Use physical counter-maneuvers such as leg crossing, squatting, or raising and resting the leg on a chair. These maneuvers increase blood pressure and can improve orthostatic intolerance.
11. Gently escalated aerobic physical activity program for graded reconditioning.

(Tr. 1192). He further attached a home exercise plan and fall prevention tips. (Tr. 1193-96).

*Other Providers*

At a January 2016 primary care visit, Plaintiff reported multiple joint pain, numbness, and swelling. (Tr. 484). On examination she had "minimal" swelling of the hands and fingers with mild tenderness over the knuckles and PIP joints. *Id.*

During a January 2017 psychological evaluation, the provider described Plaintiff's gait as "slow" but she did not require an assistive device. (Tr. 720).

Plaintiff had a normal physical examination during a March 2017 consultation for a pulmonary embolism. (Tr. 798-99).

Plaintiff saw neurologist Sushma Chennubhotla, M.D., in July 2017 for a second opinion regarding "concern for seizures" and conversion disorder. (Tr. 1154). She had a normal gait and sensation. (Tr. 1159).  Plaintiff also had normal gait and sensation during a September 2017 follow-up. (Tr. 1152-53).

Plaintiff occasionally treated with Melanie Golemblewski, M.D., from March 2016 through May 2018 for a variety of conditions (Tr. 475, 479, 1236, 1257).  During these visits, she was found to have a slow or antalgic gait (Tr. 477, 481, 1303), swollen hands with redness along all joints (Tr. 481), edema in both legs (Tr. 1238, 1259), and pain and limited range of motion in her fingers and hands (Tr. 1238, 1259).

Plaintiff had a normal neurological examination in April 2018 with the exception of "mild patchy reduction in temperature and pinprick in the lower > upper extremities" and a "narrow-based and cautious" gait. (Tr. 1224-26).

Opinion Evidence

In April 2017, Dr. Kuchynski completed an arthritis medical source statement. (Tr. 913-16). Therein, she listed Plaintiff's rheumatoid arthritis diagnosis, symptoms, and other positive objective signs. (Tr. 913). Dr. Kuchynski opined Plaintiff could walk less than one city block without rest or pain, sit for fifteen minutes at a time, and stand for ten minutes at a time. (Tr. 914). Plaintiff could sit or stand for less than two hours of an eight-hour workday and needed a job where she could shift positions at will and include periods of walking around. *Id*. She needed to walk for three minutes every ten to fifteen minutes. (Tr. 914-15). Dr. Kuchynski further opined Plaintiff required three to four unscheduled breaks during her workday, each lasting up to thirty minutes.

(Tr. 915). Plaintiff did not need to elevate her legs with prolonged sitting and did not require an assistive device for occasional standing/walking. *Id*. Plaintiff could occasionally (6%-33% of an eight-hour workday) lift and carry less than ten pounds and never more than ten; she could never twist, stoop, crouch, or climb ladders or stairs. *Id*. She could grasp, turn, or twist objects, or engage in fine manipulation or frontal and overhead reaching less than five percent of a workday for each task. (Tr. 916). Finally, Dr. Kuchynski opined Plaintiff would be off-task twenty percent of her workday, was incapable of "low stress" work, and would be absent approximately four days per month. *Id*.

In March 2018, Dr. Kuchynski penned a letter to Plaintiff's attorney which read, in part: "After a review of my previously offered opinion and a review of my current treatment notes, I am now able to affirm that the limitations in my opinion continue to be consistent with my patient's current level of functioning." (Tr. 925).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 127-43. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was physically and mentally limited as the ALJ determined Plaintiff to be. (Tr. 130-131). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a small item packager, clerical assistant, or a mail clerk. (Tr. 132-33).

Adding to the hypothetical, the ALJ asked if such a person could still perform this sedentary work if she needed to elevate both legs to waist level, alternate 50/50 between standing and

walking, and required a wheelchair. (Tr. 133-34). The VE responded that she could not, specifically citing the leg elevation requirement alone as work preclusive. (Tr. 134).

Post-Hearing Submissions

On June 11, 2018, three days after the administrative hearing, Mark L. Heckman, a vocational rehabilitation counselor, provided a letter to Plaintiff's attorney. (Tr. 450). In the letter, Mr. Heckman disagreed with the VE's conclusion that Plaintiff could perform the work of a packager, clerical assistant, or mail clerk. *Id*. He specifically found the ALJ's RFC limitation to occasional interaction with coworkers and supervisors precluded all work because a training or probationary period is required for all jobs and such a period would require more than occasional interaction with coworkers or supervisors. *Id*. Thus, he said Plaintiff would be unemployable because she would not be able to survive her training/probation period. *Id*.

In addition to Mr. Heckman's letter, Plaintiff submitted a post-hearing brief. *See* Tr. 447-49.

ALJ Decision

In a written decision dated September 5, 2018, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2021 and had not engaged in substantial gainful activity since her alleged onset date (July 11, 2016). (Tr. 60). He concluded Plaintiff had severe impairments of osteoarthritis, rheumatoid arthritis, affective disorder, asthma, degenerative disc disease, conversion disorder, dysautonomia, transitory positional orthostatic cerebral hypofusion, and obesity, but found these impairments (alone or in combination with any other) did not meet or medically equal the severity of a listed impairment. *Id*. The ALJ then set forth Plaintiff's residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is limited to frequently climbing ramps and

stairs; no climbing ropes, ladders, and scaffolds; frequent balance, stoop, kneel, crouch, and crawl; frequent bilateral handling [and] fingering; avoid concentrated exposure to atmospheric conditions such as dust, odors, fumes and pulmonary irritants; limited to performing simple, routine tasks but not at a fast-paced or high-production quota rate; limited to simple, work-related decisions; occasional and superficial interaction with supervisors, coworkers, and the public, meaning no arbitration, mediation, confrontation, negotiation, supervising others, or operating a motor vehicle; and is limited to tolerating few changes in the routine work setting, defined as occasional.

(Tr. 63). The ALJ found Plaintiff was unable to perform past relevant work; was defined as a "younger individual" on the onset date; and had a high school education. (Tr. 69). The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the national economy. *Id*. Thus, the ALJ found Plaintiff not disabled from her alleged onset date through the date of his decision. (Tr. 70).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

10

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff raises three challenges to the ALJ's decision. First, she contends the ALJ failed entirely to consider the opinion of Dr. Morren. Second, she argues the ALJ failed to properly evaluate the opinion of her treating rheumatologist, Dr. Kuchynski. Finally, Plaintiff challenges the ALJ's evaluation of her rebuttal evidence, including her rebuttal VE, Mr. Heckman. For the reasons contained herein, the Court finds no error and affirms.

Opinion Evidence

It is well accepted that medical opinions of treating physicians are accorded greater deference than non-treating physicians.[1] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

---

1. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Morren*

Plaintiff argues the ALJ erred when he failed to discuss the opinion of her "treating" neurologist, Dr. Morren "*at all*". (Doc. 13, at 5) (emphasis in original). There are two problems with Plaintiff's argument, however. First, Dr. Morren never proffered an "opinion" as defined by the regulations. And, second, Dr. Morren is not a treating source entitled to heightened deference.

First, the "opinion" to which Plaintiff refers is Dr. Morren's list of orthostatic "guidelines" – itemized above – that he offered during a single consultation appointment in November 2017. *See* Tr. 1192. Plaintiff argues these guidelines amount to a medical opinion and the "limitations" therein, including seated leg elevation, are work preclusive. (Doc. 13, at 6). Under the regulations, a medical opinion is defined as a statement from an acceptable medical source which "reflects judgments about the nature and severity of your impairment(s), including your symptoms,

diagnosis and prognosis, what you can still do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Dr. Morren's orthostatic guidelines are not a medical opinion – they are not a judgment regarding the nature (or severity) of Plaintiff's condition and they do not contain any insight as to how Plaintiff could (or could not) perform despite her impairments; they do not offer any definitive physical restrictions. The guidelines are merely a list of "tips" on how to better control an orthostatic condition non-pharmacologically – the list is generic and there is no indication that it is unique to Plaintiff in that it offers no guidance as to when, where, or how *she* should (or could) implement these suggestions. Because Dr. Morren's "guidelines" do not meet the regulatory definition of a medical opinion, they are considered part of the "evidence of record" under the regulations; as such, all that is required of the ALJ is to evaluate them as clinical notes together with any medical opinions. 20 C.F.R. § 404.1527(b)-(c). Here, it is clear the ALJ evaluated Dr. Morren's consultation notes at Exhibit 24F because he specifically cites them in his decision. *See* Tr. 64.

Second, the consultation appointment during which these guidelines were proffered was the only time Plaintiff saw Dr. Morren. Plaintiff has not identified any other neurology visit between the two. 20 C.F.R. § 404.1527(a)(2) ("Generally, we will consider that you have an ongoing treatment relationship. . . when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."); *Kornecky v. Comm'r of Soc. Sec*., 167 F. App'x 496, 506-07 (6th Cir. 2006) (a single visit does not constitute an "ongoing treatment relationship"). The two had no treatment relationship, lending credence to the Commissioner's argument that the guidelines are not an opinion entitled to treating physician benefits. As a non-treating source, Dr. Morren was not in a position to offer an opinion of the long-

13

term nature and severity of Plaintiff's conditions, nor how such would factor into her skills or abilities. Dr. Morren even noted that more testing was needed. *See* Tr. 1190 ("Additionally, her sensory exam could suggest an underlying small fiber neuropathy as well. The patient requires completion of her autonomic neuropathy work up.").

Because Dr. Morren is a non-treating source and did not proffer a medical opinion, his treatment notes are merely a part of the evidence of record which the ALJ was only required to consider. The ALJ fulfilled this obligation. There is no error.

*Dr. Kuchynski*

Plaintiff next argues the ALJ erred when he failed to provide the required "good reasons" for discounting the opinion of Dr. Kuchynski, her treating rheumatologist.

Here, after setting forth the treating physician standard, the ALJ addressed Dr. Kuchynski's opinion and explained the weight assigned:

> I accord little weight to the arthritis medical source statement and letter provided by Marie Kuchynski, MD on April 26, 2017 and March 5, 2018 (Ex. 13F/1-4; 14F). While Dr. Kuchynski is a treating, acceptable medical source, her opinion is not supported by the record, including contemporary treatment notes, which generally showed benign physical and mental status exams (Ex. 10F/4; 17F/49). There is little indication in the record to support such severe functional limitations or that the claimant would be off task 20% of the day (Ex. 3F/5; 4F/13; 9F/20; 23F/49).

(Tr. 66).

The ALJ began by noting that Dr. Kuchynski's opinion was unsupported by the record in general and by contemporary treatment notes showing benign examinations. *Id*. In support, the ALJ cites to two benign examinations, one by Dr. Kuchynski herself, each performed close to the time the opinion was rendered. *Id.* (citing Tr. 799, 1031). While Plaintiff is correct that Dr. Kuchynski's notes (including Tr. 1031) generally noted "mild" swelling in the fingers and wrists, the rest of her notes from each visit were often benign, including the psychiatric portions which

14

were completely normal. (Tr. 616, 628, 633, 638, 714, 1031, 1038-39). The ALJ explained here that such benign notes do not support the severe functional limitations offered by Dr. Kuchynski, including any support for a 20% off-task limitation. (Tr. 66). For additional support, the ALJ cited to four treatment notes from different providers which offered similar benign assessments. (Tr. 66) (citing Tr. 576, 616, 742-43, 1285). As explained, a treating physician's opinion is only given controlling weight when it is not inconsistent with other evidence of record, *Wilson,* 378 F.3d at 544, and record inconsistency is a "good reason" to accord little weight to a treating opinion, *Rabbers*, 582 F.3d at 660. Here, the ALJ found Dr. Kuchynski's opinions inconsistent with the record, including some of her own treatment notes. The ALJ's finding is supported by the specific examples he cited in support and provide sufficient "good reasons" for discounting the opinions.

Plaintiff also seems to rely on her periodic use of a wheelchair (and Dr. Kuchynski's wheelchair prescription) as evidence to support the need for greater limitation. According to the Sixth Circuit, if an assistive device "[is] not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). For an ALJ to find an assistive device medically necessary, there must be medical documentation establishing the need for an assistive device to aid in walking or standing, and documentation "describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7. Plaintiff's use of a wheelchair was periodic at best and there is nothing in the record to show any provider instructed her on how or when the device was needed. The ALJ fully considered Plaintiff's wheelchair use and described it as "intermittent" and "variable", citing several treatment notes in support. (Tr. 65) (citing Tr. 1026 (Plaintiff describing her use of a wheelchair for "long distances"); Tr. 1031, 1159, 1166 (normal

gait on examination)). And, though Dr. Kuchynski prescribed a wheelchair, her own opinion – the opinion Plaintiff argues should have been given greater weight – specifically states that Plaintiff did *not* require the use of any assistive device and did *not* need to elevate her legs. *See* Tr. 915. As such, to the extent Plaintiff argues the ALJ should have included wheelchair use in the RFC, the Court finds the ALJ did not err.

For these reasons, the Court concludes there is no error in the ALJ's evaluation of Dr. Kuchynski's opinion and affirms.

<u>VE Testimony</u>

Finally, Plaintiff argues the ALJ failed to properly consider her rebuttal evidence, including arguments raised in a post-hearing Memorandum of Law and the opinion of her rebuttal VE, Mark L. Heckman. Specifically, Plaintiff offers two arguments. First, in her Memorandum of Law to the ALJ (Tr. 447-49), and again to this Court (Doc. 13, at 15-16), Plaintiff contends the ALJ erred by relying on the Dictionary of Occupational Titles ("DOT") because it is outdated and unreliable. Relatedly, in her second argument, Plaintiff argues the ALJ failed to properly consider the opinion of Mr. Heckman who relied on more updated data from "O*Net", an occupational search platform.

*The DOT*

The root of Plaintiff's first argument is that "blind adherence to the DOT . . . is not appropriate and . . . [is] inconsistent with the regulatory requirement that vocational testimony be based upon *up-to-date and reliable sources*." (Tr. 448) (citing 20 C.F.R. §§ 404.1560, 404.1566) (emphasis in original). Instead, Plaintiff urged the ALJ to rely on more updated information found within an occupational search platform called "O*Net". *Id*.; (Doc. 13, at 22-25); (Doc. 18, at 7-10). Specifically, she notes the DOT lists the three jobs offered by the hearing VE as "unskilled" where O*Net does not. (Doc. 13, at 22). Therefore, she contends the ALJ erred in finding she could

16

perform the jobs identified by the hearing VE, based on Mr. Heckman's statement – relying on O*Net – that a person who could only have occasional interaction with coworkers and supervisors could not perform such jobs. *Id*. at 23-24.

To be clear, an ALJ does not err when he relies on information contained in the DOT – nor does he err when relying on a VE who bases his testimony upon it. The regulations could not be any clearer – the Agency "*will* take administrative notice of *reliable* job information from various governmental and other publications", specifically listing the DOT as one among five examples of "reliable" information. *See* 20 C.F.R. § 404.1566(d) (emphasis added); *O'Neal v. Comm'r of Soc. Sec*., 799 F. App'x 313, 318 (6th Cir. 2020) ("[T]he DOT continues to be recognized as a source of reliable job information [.]"). Notably, O*Net is not included in this list. *Id*. The DOT is so important, the Agency "rel[ies] *primarily* on the DOT for information about the requirements of work in the national economy". SSR 00-4p, 2000 WL 1898704, at *2 (emphasis added). A VE's testimony "should be consistent with the occupational information supplied by the DOT". *Id*. When it is not, only then is the ALJ required to inquire about the conflict and "obtain a reasonable explanation for the conflict." *Id*., at *4. Beyond this initial inquiry, however, the ALJ is under no obligation to further investigate the accuracy of a VE's testimony "especially when the claimant fails to bring any conflict to the attention of the [ALJ]." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008). Notably, nothing in the rules dictates that an ALJ must resolve conflicts between a VE's testimony and O*Net, nor between the DOT and O*Net.

Plaintiff argues heavily against DOT reliance by the ALJ and this Court citing unreliability due to out-of-date information. However, the Agency's rules and regulations dictate otherwise. Here, the ALJ's reliance on the DOT, and the VE's testimony upon it, directly comports with such. There is no error.

*Mr. Heckman's Vocational Opinion*

Plaintiff next argues the ALJ failed to properly evaluate the opinion of her rebuttal VE, Mr.

Heckman. As to Mr. Heckman's opinion, the ALJ determined:

> I accord little weight to the non-medical opinion of vocational expert, Mark L. Heckman, Med, CRC, LPC, submitted after the hearing on June 11, 2018 (Ex. 15E). No disclosure was made under the five-day rule or at the hearing that this opinion would be offered. Additionally, there was no opportunity to cross-examine Mr. Heckman, unlike the vocational expert at the hearing, Mr. Nimberger. While the specific jobs offered by Mr. Nimberger were not disclosed until the hearing, this was not a "surprise" or "unanticipated testimony." Claimant's representative is an experienced practitioner in disability claims, and has appeared in many prior cases in which Mr. Nimberger has testified as the vocational experience, including, as I know from my personal experience in such cases in which he has appeared before me, prior cases in which Mr. Nimberger has provided the identical, or similar unskilled, jobs to those provided in this case. There was nothing surprising or unanticipated about Mr. Nimberger's testimony in this case to this representative. Furthermore, there was no disclosure regarding Mr. Heckman's financial arrangement for retaining his services or compensation fee agreement to support that his opinion is impartial. Mostl[]importantly, however, Mr. Heckman's opinion that it could take more time than the residual functional capacity provided to train for the identified positions is entirely speculative. No specific discussion was rendered about the specific jobs provided by Mr. Nimberger and it is speculative to conclude that learning simple unskilled work such as a packager, clerical assistant, or mail clerk work would require more than the occasional and superficial interaction described in the residual functional capacity, as these unskilled jobs by definition can be learned quickly. For example, clerical assistant duties would include photocopying, of which a short demonstration may be sufficient to show a new employee how to use the copier, what to copy, and what to do with the copies. A similar short demonstration may be sufficient on packaging and mail clerk duties. Any errors in performance could also be quickly remedied in this type of work, and would not reasonably be expected to take more than 1/3 of the workday as the opinion of Mr. Heckman speculates. Accordingly, the undersigned instead accepts Mr. Nimberger's testimony that these specific jobs are available within the vocational guidelines provided. Mr. Heckman's opinion provides no basis for his conclusions otherwise, and he discusses other jobs not pertinent to the specific jobs identified by Mr. Nimberger. Therefore, I find Mr. Heckman's opinion unpersuasive and gives it little weight.

(Tr. 67).

Here, the ALJ gave several supported reasons for finding Mr. Heckman's opinion

"unpersuasive" and Plaintiff takes issue with each. First, the ALJ noted Plaintiff failed to properly

disclose the rebuttal opinion under the "five-day rule" which provides that an ALJ may decline to

consider evidence submitted later than five business days before a scheduled hearing. 20 C.F.R. §
404.935(a).  The Memorandum of Law and Mr. Heckman's letter were submitted three days after
the hearing concluded, eight days beyond the deadline. *See* Tr. 86, 450. Plaintiff argues the rule
was primarily designed for medical evidence known long before the hearing and other district
courts have made five-day rule exceptions for rebuttal VE testimony because, logically, the need
for (or existence of) rebuttal VE evidence would not exist until *after* the hearing where a VE
testifies for the first time. (Doc. 13, at 17-19). This argument is certainly persuasive and might
provide grounds for reversal if it were the *only* reason given by the ALJ for rejecting the opinion,
or if he failed to consider it in the first place – unfortunately for Plaintiff, neither scenario applies
here and thus the Court declines to find error on this basis.

Plaintiff next argues that, contrary to the ALJ's assertion, the VE's testimony was indeed
"surprise testimony" which required rebuttal. The ALJ explained that, while the hypothetical given
by the ALJ, or the jobs offered by the VE, may have been a surprise, the VE's testimony was not,
especially for an experienced social security practitioner like Plaintiff's attorney. (Tr. 67). Plaintiff
argues she could not possibly prepare rebuttal evidence *before* a hearing. Fair enough. However,
this misses the ALJ's point entirely as she had one unused tool in her rebuttal arsenal – cross-
examination. The Sixth Circuit, as well as this Court, have held that a plaintiff forfeits arguments
regarding deficient VE testimony where no cross-examination is conducted to probe the
deficiency. *See Barrett v. Barnhart*, 355 F.3d 1065, 1067 (6th Cir. 2004) ("[B]ecause Barrett's
lawyer did not question the basis for the vocational expert's testimony, purely conclusional though
that testimony was, any objection to it is forfeited."); *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x
977, 982 (6th Cir. 2011); *Stamper v. Comm'r of Soc. Sec.,* 2019 WL 2437813, at *8 (N.D. Ohio);
*see also O'Neal*, 799 F. App'x at 318 ("Because the DOT continues to be recognized as a source

of reliable job information and O'Neal did not cross-examine the vocational expert when he had the opportunity, the vocational expert's testimony constitutes substantial evidence to support the ALJ's finding that O'Neal was able to perform work that existed in significant numbers in the national economy."). Plaintiff was made aware of the ALJ's hypotheticals and the jobs offered by the VE in response immediately after they were offered during the hearing. If Plaintiff's hearing counsel believed there was an error with the skill level assigned to each job by the VE, or believed the ALJ and VE's reliance on the DOT to be in error, as counsel now attempts to, he had ample opportunity to cross examine on these issues *during the hearing*. Plaintiff's hearing counsel chose not to and Plaintiff has forfeited the arguments.

Finally, the ALJ took issue with Mr. Heckman's opinion that the limitation of "occasional interaction with coworkers and supervisors precludes all work" because "the training and probationary period for any job would require more than occasional interaction [] with co-workers and supervisors." (Tr. 450). The ALJ concluded this opinion was highly speculative as Mr. Heckman offered no basis for this conclusion whatsoever. The Court agrees.

For these reasons, the Court finds no error in the ALJ's evaluation of Plaintiff's rebuttal evidence and affirms.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE